UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

ORACLE AMERICA, INC.,                    )
a Delaware corporation                   )
500 Oracle Parkway                       )
Redwood Shores, CA 94065                 )
                                         )
         Plaintiff,                      )
                                         )
v.                                       )          Civil Action No. 16-451
                                         )
SYLVIA MATHEWS BURWELL,                  )
Secretary, U.S. Department of Health     )
and Human Services                       )
200 Independence Avenue, S.W.            )
Washington, DC 20201                     )
                                         )
         Defendant.                      )
_____)

**COMPLAINT FOR A WRIT OF MANDAMUS**

Plaintiff Oracle America, Inc. ("Oracle") brings this Complaint for a writ of

mandamus to require Sylvia Mathews Burwell, in her official capacity as Secretary of the

United States Department of Health and Human Services ("HHS"), to exercise her

mandatory duty under the Patient Protection and Affordable Care Act ("ACA") to monitor

the integrity and performance of states that receive Federal grant funds for the purpose of

establishing state-based health insurance exchanges by: (a) directing the State of Oregon—

HHS's grantee—to seek to stay or dismiss the state-court lawsuit it has filed against Oracle

and several Oracle employees for actions they allegedly took to assist Oregon with the

creation of its Health Insurance Exchange ("HIX"); and (b) monitoring and investigating

all work Oregon and its subgrantees and contractors, including Oracle, did on the Oregon

HIX project in order to determine what liabilities involving Federal funds, if any, have arisen from the project.

## INTRODUCTION

1.      HHS partnered with the State of Oregon through certain Cooperative Agreements to establish a state-run health insurance exchange ("the HIX") under the ACA. The Cooperative Agreements awarded Oregon hundreds of millions of dollars in Federal funds.  With these Federal funds, Oregon hired contractors, including Oracle, to help it build the HIX.

2.      Oregon state agencies and Cover Oregon, a public corporation that the Oregon legislature established to build and administer the HIX, grossly mismanaged the development of the HIX.  Their mismanagement delayed the scheduled launch of the HIX's citizen self-service web portal.  The media and the public held then-Governor John Kitzhaber accountable for the delay.  Emails made public last year reveal that the Governor, embroiled in a contested re-election fight, directed the political operatives advising his campaign to shore up his re-election efforts by quelling the HIX controversy.  With the Governor's full support, these operatives orchestrated a scheme to shut down the HIX, to claim falsely that it was an unsalvageable technological failure, and to blame Oracle for its demise.

3.      In executing this scheme, the Governor's political operatives took several measures.  First, with the Governor's knowledge and approval, they took control of decision-making at Cover Oregon from Cover Oregon's ostensibly independent board of directors.  Second, under the Governor's direction, they engineered a plan to have Cover Oregon terminate the HIX, even though two of the HIX's enrollment channels were fully

operational and the final channel, the citizen self-service web portal, was complete and nearly ready to launch for public use.  Third, under his operatives' guidance, the Governor embarked on a public relations campaign to blame Oracle, rather than State agencies and Cover Oregon, for the HIX's demise, even though the State and Cover Oregon had chosen to shut down the HIX themselves for partisan political purposes.  As the capstone of the public relations campaign, Oregon sued Oracle and several of its managerial employees *personally* to recover for the State itself the Federal funds that the State and Cover Oregon had obtained to pay Oracle for its work on the HIX.  Oregon's lawsuit was a brazen attempt not only to avoid political accountability for the fate of the HIX, but also to escape potential liability to the Federal government for having mismanaged the HIX and ultimately for having squandered over $300 million in Federal funds to promote and protect the Governor's personal political interests at the expense of the ACA's objectives.

4.      Oregon's lawsuit—*Rosenblum v. Oracle America, Inc.,* No. 14C20043, Marion County Circuit Court—usurps vital federal interests.  It seeks to recover for the benefit of Oregon the Federal funds that Oregon itself squandered when it terminated the HIX.  It attempts to foist all of the blame for the HIX's issues on to Oracle, when internal communications and objective third-party reports alike demonstrate that Oregon bears responsibility.  And it supplants the Secretary's non-discretionary obligation under the ACA to oversee and investigate the integrity and performance of Oregon and its contractors, including Oracle, and to make her own independent determination about whether Oregon or any of its contractors mismanaged or misused Federal funds on the HIX project.

5.     HHS and the Secretary are fully aware of the pertinent evidence demonstrating Oregon's mismanagement of the HIX, its decision to terminate the HIX for purely political reasons, and its decision to sue Oracle in order to cover up that decision and evade its own liability.  Yet, to date, HHS has taken no action to address either Oregon's misuse of Federal funds or its conflict of interest-infected usurpation of the Federal government's obligation to enforce the ACA's prohibitions against waste, fraud and abuse.

6.     The need for Federal intervention is especially dire because the actions Oregon has taken—all of which involve the Federal funds used to develop the HIX—have been extreme.  The ACA imposes a mandatory duty on the Secretary to monitor the integrity of state grantees and state health insurance exchanges, and Oregon's suit and the events preceding it undoubtedly implicate Oregon's integrity:

a.     Oregon is proceeding with its lawsuit in the face of a glaring conflict of interest.  The State is itself exposed to significant financial liability to the Federal government due to its own well-documented mismanagement of the HIX, as well as its unwarranted decision to terminate the HIX.  Oregon also faces potential liability to the Federal government for another related reason:  it knowingly lied to HHS about the status of the HIX project in order to secure continued ACA funding.  Testifying officially as the State's representative at a recent deposition, the Oregon Department of Justice's Deputy Attorney General admitted under oath that, in a mandatory report submitted to HHS in August 2013 to obtain additional funding for the HIX, the Oregon Health Authority ("OHA") *falsely* informed HHS that it had

"successfully delivered a functional [HIX] to Cover Oregon" months earlier. That false statement potentially requires Oregon to reimburse HHS all HIX-related Federal funds Oregon received after making it, *see* 45 CFR 92.43(a), in much the same way that any similar false statement by a non-state federal grantee would trigger potential federal False Claims Act liability for post-statement disbursements.

b.      Oregon is proceeding with unclean hands. Substantial evidence shows that Oregon shut down the HIX and sued Oracle not to achieve the objectives of the ACA, but because the former Governor and his campaign operatives believed he needed to deflect blame onto Oracle for the problems with the HIX that were compromising his re-election efforts.

c.      Oregon's entire lawsuit is unauthorized, unlawful, invalid, and *ultra vires* because it seeks to recover Federally-granted funds using Oregon law, which both Oregon law and Federal law proscribe. Oregon's action impermissibly usurps Federal authority by invoking Oregon's own laws to determine the legality and allowability of the expenditure of Federal funds awarded under Cooperative Agreements governed by Federal law.

7.      In these circumstances, the Secretary has exclusive, plenary authority and a mandatory obligation under the ACA to investigate the integrity and performance of Oregon and the contractors Oregon used to build the HIX. She is obligated to (a) direct Oregon—HHS's grantee—to seek to stay or dismiss its lawsuit against Oracle, and (b) monitor and investigate all work Oregon and its subgrantees and contractors, including

5

Oracle, did on the HIX project in order to determine whether Oregon, Cover Oregon or any of their contractors mismanaged or misused Federal funds on the HIX project.

8.     Oracle has formally asked HHS to exercise its oversight responsibilities no fewer than three times over the past year, but it has stood silent, taking no action and offering no response.

## PARTIES

9.     Plaintiff Oracle is a subsidiary of Oracle Corporation and is a Delaware corporation whose principal place of business is Redwood Shores, California.

10.     Defendant Sylvia Mathews Burwell, sued only in her official capacity, is the Secretary of HHS.  Congress has required her to provide for the efficient and non-discriminatory administration of the activities of the HIX and to implement any measure or procedure that she determines to be appropriate to reduce fraud and abuse in the administration of the HIX.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction under 28 U.S.C. § 1361.

12.     Venue is proper in this Court under 28 U.S.C. § 1391.

## FACTS

13.     Oregon has sued Oracle to recover the Federal funds it received to establish the HIX, despite having badly mismanaged the HIX project, despite having lied to HHS about the status of the HIX to procure Federal funds, and despite having chosen to terminate the HIX itself in order to facilitate the re-election of its incumbent Governor.  Oregon is thus acting with unclean hands and under an irremediable conflict of interest, essentially attempting to cover up serious breaches of its own obligations as a recipient of Federal

funds under ACA.  The lawlessness of Oregon's effort to usurp the Secretary's plenary authority to determine the lawfulness and allowability of the expenditure of Federal funds obligates the Secretary to exercise her mandatory oversight duties under the ACA, as described below.

## I.      The History of Oregon's Health Insurance Exchange

### A.      *The Development of the HIX Was Plagued by Mismanagement and Delay*

14.      Former Oregon Governor John Kitzhaber, while in office, achieved significant national attention through his advocacy for comprehensive healthcare reform. Following passage of the ACA, he made modernizing the delivery of healthcare in Oregon his signature issue.

15.      At the time the ACA was enacted, Oregon was already planning a large-scale, intensive project to modernize the delivery of its own health and human services programs (the "Modernization Project").  The ACA prompted Oregon to add the development of the HIX to these already elaborate plans.  Thus, unlike any other state in the country, Oregon undertook two massive, complex IT projects at once:  modernizing the delivery of its existing social services programs and building a health insurance exchange.

16.      The requirements of the ACA made Oregon's goals even more ambitious. They imposed a hard deadline of October 1, 2013 for launching the HIX and mandated that the HIX be financially self-sustaining by January 1, 2015.

17.      In 2011, in the wake of the passage of the ACA, Oregon enacted its own legislation creating an ostensibly independent public corporation, the Oregon Health Insurance Exchange Corporation, also known as Cover Oregon, to run the HIX.

18.     The Oregon legislature carefully structured Cover Oregon's board of directors and managerial leadership to be well-insulated from political interference by the Governor, his staff or anyone else.   ORS 741.001(1); ORS 741.025(1) (2014).   The Governor's only powers in relation to Cover Oregon were (i) to appoint seven members of its board of directors; and (ii) to remove them, after notice and public hearing, only for incompetence, neglect of duty, or malfeasance in office.   ORS 741.025(1), (3)(a) (2014). The legislature specified that the Governor's removal authority was limited to a maximum of three out of seven board members in a four-year period, ORS 741.025(3)(a) (2014), further insulating Cover Oregon from interference by the State's executive branch. Additionally, Cover Oregon's Executive Director was appointed by, served at the pleasure of, and was subject to policy direction of the board of directors—and no one else.   ORS 741.201(1), (3).   Cover Oregon's statutory mandate required it to administer Oregon's HIX in "the public interest" and in a manner "accountable to the public."   ORS 741.001(2), (5).

19.     In addition to these Oregon statutory provisions, Federal regulations required Cover Oregon to implement several governance principles. These principles included ethics, conflict of interest standards, accountability standards, transparency standards, and the disclosure of Cover Oregon's board members' financial interests.   45 C.F.R. 155.110(d)(1)-(2).

20.     Consistent with these Oregon statutory and Federal regulatory provisions, Cover Oregon's Director in 2014, Clyde Hamstreet, described Cover Oregon as an "independent" and "freestanding quasi-governmental agency."

21.     Under the ACA, Oregon obtained hundreds of millions of dollars in Federal funds to work on Governor Kitzhaber's medical services-related projects.   After receiving

an initial Planning Grant of $1 million in 2010 to support its planning work for building an exchange, the Oregon Health Authority ("OHA") received nearly $60 million in Early Innovator grants from the Centers for Medicare and Medicaid Services ("CMS") to build a program allowing any Oregonian who wanted health insurance to be referred either to Oregon's Medicaid program or to the private insurance market, depending on eligibility. Subsequently, Cover Oregon applied for and received nearly $245 million in Establishment Grants under the ACA. All told, Oregon and Cover Oregon received more than $300 million in Federal funds to plan, build and run the HIX.

22.     The extraordinary amount of money Oregon received, given the State's relatively small size, was a reflection of the State's extraordinarily ambitious plans. By procuring over $300 million to develop the HIX, Oregon—the nation's 27th most populous state, with roughly four million residents—received more money under the ACA than all but two other states: California, the most populous state, with a population ten times greater than Oregon's, and New York, the third most populous state, with a population five times greater than Oregon's. Oregon received more in funding than a number of larger states, including larger states that, like Oregon, tried to establish their own exchanges: Washington, Colorado, Maryland, Wisconsin, Massachusetts, and Kentucky. Upon information and belief, Oregon, on a per capita basis, received more money from HHS under the ACA than any other state in the country.

23.     In mid-2011, using its Planning Grant and the first $48 million tranche of its Early Innovator grants, the OHA purchased Oracle hardware, software and consulting services and began work on both the HIX and Modernization projects. The contracts with

Oracle for consulting services were time-and-materials contracts under which Oregon was to direct and supervise all work on the project.

24.     Oregon considered engaging the services of a systems integrator to help it manage the Modernization and HIX projects and the various service providers it retained for assistance.  A systems integrator on a massive IT project serves roles analogous to those of an architect and general contractor on a construction project.  The systems integrator assures that the project scope is well-defined, capable subcontractors are engaged, milestones are established and met, and the project is built to the owner's specifications.  For reasons of its own, Oregon chose not to hire a systems integrator.  Instead, it elected to assume that role itself, installing *policy* advisors, rather than experienced IT professionals, to lead a complex *technology* project that, because of the inclusion of the Modernization Project, was more ambitious in scope than that of any other state, particularly in the face of the deadlines the ACA imposed.

25.     By early 2013, OHA started running out of funds.  Cover Oregon had, by then, received substantial Establishment Grants and had begun assuming responsibility for completing the HIX.  Cover Oregon formally engaged Oracle to help it with the HIX in March 2013.   While OHA continued to work on the Modernization Project, Oregon transferred the HIX project to Cover Oregon shortly after Cover Oregon signed its first contract with Oracle.  Like OHA before it, Cover Oregon did not engage a systems integrator to manage all of the contractors and work being performed on the HIX, but instead assumed that responsibility itself.

26.     Because OHA and, later, Cover Oregon chose to serve as their own systems integrators, they were in the leadership, decision-making and managerial roles on the HIX

project.  Oracle had no role in determining the project's scope or requirements.  Oracle's contracts were clear that its role was to "assist" OHA and Cover Oregon and work "at the direction" of OHA and Cover Oregon employees on a "time and materials basis."  OHA and Cover Oregon controlled the architecture of the system, the key specifications, the workflow, and the system design.  Further, OHA and Cover Oregon were responsible for the day-to-day management of the project, including, most importantly, the schedule for development and the discipline around system and design changes.

27.     The State's Quality Assurance vendor, Maximus, raised concerns early on about the risks of the State's decision to proceed with the HIX and Modernization projects in tandem, under the ACA's deadlines, while acting as its own systems integrator. Maximus's Initial Risk Assessment Report in November 2011 contains multiple warnings about Oregon's proposed approach:

- "This new multi-vendor approach will require the State to act as the Prime Contractor and assume more of the overall project risk."

- "The requirements of the project will be extensive and expected to change throughout the development of the project.  Managing these requirements across three organizations and, depending on the final approach to a Configuration and Solution Integrator procurement, three key vendors is a risk."

- "If the State is to take on more responsibility with respect to being the prime contractor it will need to ensure it has a comprehensive plan for managing the security of the project strategically, tactically, and operationally."

- "If … the State places itself in a role of Prime Contractor managing multiple contractors it must deploy the needed managerial resources, state of the art tools

(such as requirements management tools, etc.) and maintain a commitment to its role."

28.     Despite these warnings, OHA and, later, Cover Oregon remained steadfast in their decisions to serve as systems integrators.  They performed that function for the duration of the HIX and Modernization projects.

29.     Oregon's efforts to manage the development of the HIX proved disastrous. Oregon's competence in pursuing the HIX and Modernization projects simultaneously under the ACA's deadlines simply did not match the State's ambitions.  Acting as their own project managers, OHA and Cover Oregon compromised the project by constantly changing and redefining the requirements that dictated how contractors, including Oracle, needed to configure the HIX's technology.  State and Cover Oregon personnel did not follow their own standard processes for submitting change requests, which altered both the scope and the requirements of the project.  Constant changes led to duplicative work that delayed completion dates for certain project components and ultimately threatened the target launch date of October 1, 2013.

30.     Several different independent project assessments, both contemporaneous and retrospective, blamed State agencies and Cover Oregon for mismanaging and delaying the project.

31.     From its initial report in November 2011 up through the ACA's October 1, 2013 rollout deadline, Oregon's Quality Assurance vendor, Maximus, provided repeated, detailed, dire warnings about the state of the project and the likelihood of noncompliance with the deadline.  OHA and Cover Oregon management consistently ignored these warnings, as did State officials with oversight responsibility, including former Governor

Kitzhaber.

32.     Maximus warned in its November 2011 Initial Risk Assessment, "At this time, the overall project is facing significant risks, including lack of complete detailed requirements, incomplete scope definition, and an undefined schedule … ."  In its March 2012 Updated Initial Risk Assessment, Maximus wrote:

> While the high-level scope has been approved … , there remain areas where minimal progress has taken place.  Primarily, requirements at an adequate level of accuracy and detail to support the approved scope are not complete.  And, communication among various groups in order to finalize and approve requirements needs clarification and management.

Maximus concluded, "After one year … , the lack of a well-documented, industry standard, detailed set of business requirements, approved by the customer, is a major risk to the success of the project."

33.     In 2012, Maximus began to prepare monthly "QA Status and Improvement" reports.   Starting in June 2012, Maximus observed that Oregon continued to leave undefined certain, critical project requirements:

> Requirements definition is ongoing but is not yet at an adequate level of accuracy and detail to support the intended scope.   In addition, the finalization and approval process for requirements and design specification clarification and management has not been completely defined.

Maximus included this specific observation in each and every monthly report through December 2012.  The broader point that the State continued to fail to lock down vital project requirements appeared in Maximus's "Monthly Quality Status" reports throughout 2013 as well.  As late as Maximus's August 2013 report, which was dated September 13, 2013—eighteen days before the go-live deadline of October 1—Maximus warned, "Scope identified for the first release is still considered large for the amount of time left until launch

… ."  Because of the State's failure to heed these warnings, Maximus consistently rated the overall status of the project as "red" or "high risk."

34.     When the OHA transferred the HIX work to Cover Oregon in the spring of 2013, the HIX was far from complete.  Indeed, neither the State nor Cover Oregon had even finalized the functional requirements for the project by then (a problem that would persist for many more months), rendering it literally impossible for Oracle to complete the work.  Nevertheless, in August 2013, instead of truthfully reporting the status of the HIX to HHS, the State falsely certified to HHS that "OHA through the HIX-IT project successfully delivered a functional insurance exchange to Cover Oregon on April 30, 2013."  Oregon made this false report as part of the written Annual Update it was required to provide to HHS in order to secure continued Federal funding for the HIX project.  *See* 45 CFR § 92.40(b)(1) – (2)   & (d); HHS Grants Policy Statement at II-82 – 83. Significantly, Oregon *knew* that that its certification of success was untrue.  Indeed, at a recent deposition, Oregon's Deputy Attorney General, testifying in a representative capacity for the State, affirmed *under oath* that the certification was false.  Yet OHA made the certification anyway in order to secure the continued flow of Federal grant funds.

35.     In a January 2014 interview, former Governor Kitzhaber claimed that he was not aware of the problems with the development of the HIX until after Cover Oregon missed the October 1, 2013 go-live deadline.  This was demonstrably untrue.  For nearly two full years leading up to the scheduled launch date, former Governor Kitzhaber and his staff had received the Maximus reports warning the State about the problems with the development of the HIX.

36.     In spring 2014, a Governor-initiated analysis from consulting firm First Data echoed the contemporaneous assessments Maximus had made from 2011-2013.  It confirmed that Cover Oregon's mismanagement, poor supervision and technical incompetence, as well as its miscommunication and infighting with the OHA, plagued the HIX's development.  First Data concluded that "the decision to not use an overall system integrator for the project depart[ed] from best practices.  This decision created a lack of accountability on the project.  It contributed to a lack of scope control, a delay in requirements definition, and unrealistic delivery expectations."  The report further concluded that Cover Oregon lacked "a consistent, cohesive enterprise approach" to project management, that Cover Oregon and OHA "had different, and sometimes competing priorities," and that communication between the agencies "was ineffective and at times contentious."

37.     In September 2014, one of Cover Oregon's executive directors, Clyde Hamstreet, authored a similarly scathing report documenting Cover Oregon's self-inflicted failures.  The report was so damning that State and Cover Oregon officials asked Hamstreet to keep it in draft form and to deliver his findings orally only, so as to avoid creating a final document that would become publicly available.  The State and Cover Oregon then fought to keep the draft report and an accompanying PowerPoint presentation from being disclosed under Oregon's public records act.  The report, which was ultimately disclosed under the public records act, concluded that, when Hamstreet arrived in April 2014, "the financial and operational situations were on the verge of collapse" due to "prior planning, direction and management."  Hamstreet condemned Cover Oregon's "dysfunctional management," "weak financial controls and business processes" and a "processing

backlog" that left "large piles of untouched work … accumulated," including "Medicaid redeterminations, carrier assessment billings, and … member life changes ('Qualifying Life Events')."   As to Cover Oregon's management of its IT systems, Hamstreet wrote: "Cover Oregon relied on Oracle to provide the needed services but did not have an effective independent problem identification or management process in place to guide that relationship or fill in the gaps to enable independent operations.   Cover Oregon had no formal service level expectations or effective service level agreement with Oracle."

38.   In the PowerPoint presentation that accompanied Hamstreet's report, the very first slide included the following bullet points under the heading "Dysfunctional Management" to describe what he observed when he arrived:

- Lack of experience or ability
- Little accountability
- Disagreement over high-level objectives
- Unprofessional conduct
- Ill-will and poor cooperation between [Cover Oregon] and [the Oregon Health Authority]
- Unclear lines of authority
- Poor communication
- Inadequate or missing policies and procedures in important areas
- Ad hoc decision-making with little support or documentation

The PowerPoint also emphasized that "planning for Oregon's health insurance exchange should be done in a more businesslike manner," that there had been "excessive politicization of healthcare reform nationally and in the state," and that, going forward, there was a "need to get politics out of the picture."

39.   The Governor himself acknowledged the dysfunction Hamstreet, First Data and Maximus found.   For instance, the Governor asserted, "[T]o date Cover Oregon has not developed core competencies concerning the IT platform, enrollment, sustainability,

etc. - it is imperative that those competencies be attained before the November [2014] open enrollment period.  If this does not happen the disastrous first open enrollment period will plague us for the next 4 years."

40.     Due to the delays resulting from the managerial incompetence and dysfunction of State agencies and Cover Oregon, the HIX was not ready to go live by its scheduled launch date of October 1, 2013.  As of the launch date, Cover Oregon still had failed to finalize, deliver or lock down many project specifications.

41.     Cover Oregon nonetheless remained committed to opening the HIX despite the missed deadline.  It continued to direct Oracle to provide substantial resources to the project, which ultimately included the services of Oracle's chief corporate architect, a specialized team of engineers, and additional experts in testing, release management and software products.  Throughout the remainder of 2013, Oracle and Cover Oregon employees worked diligently together, in the face of significant time pressure and public scrutiny, to complete the HIX in time to enroll individuals in health insurance plans within ACA deadlines.

42.     Cover Oregon continued its pattern of delay in finalizing project requirements and continued to make changes that adversely affected work that already had been completed.  However, with Oracle's support, Cover Oregon was able to launch two of the HIX's three enrollment channels in late 2013.  These two channels were used, respectively, by Cover Oregon customer service representatives ("CSRs") and community partners and agents ("CPAs").  Each channel permitted individuals—often people who either were unable to navigate a website independently or who had no internet access—to fill out a paper application form.  These individuals submitted completed applications to

CSRs or CPAs, who in turn used their channels to access the HIX and complete the enrollments electronically.   The use of the CSR and CPA channels facilitated the enrollment of more than 430,000 Oregonians in health insurance and Medicaid in the first year.

43.     By February 2014, Oracle also had helped Cover Oregon create the third and final enrollment channel, a functional citizen self-service web portal that would enable customers to shop for and purchase insurance online themselves.   This final enrollment channel relied on essentially the same technology as the CSR and CPA channels, but furnished a different means of access.   Bruce Goldberg, Cover Oregon's then-acting Executive Director, told Governor Kitzhaber on February 27, 2014, that Cover Oregon believed the self-service web portal could "function with a 90+ percent of accuracy for 90-95 percent of the population."

44.     Cover Oregon officials informed Oracle that it remained committed to launching the self-service channel and, in late February 2014, provided Oracle with a revised schedule for a spring 2014 rollout.   Various project-related documents demonstrate the viability of the self-service channel by that time.   With assurances from both Cover Oregon and Governor Kitzhaber, Oracle anticipated a successful launch.

45.     Then politics got in the way.

46.     Governor Kitzhaber was facing re-election in the fall of 2014, and the failure to launch the HIX on time had become a political problem for him, drawing criticism from the media and political opponents alike.   For example, one editorial in *The Oregonian* noted that the problems with Cover Oregon had caused many of Governor Kitzhaber's "constituents to question whether a competent adult really [wa]s in charge" and opined that

"Kitzhaber's reputation collapsed along with Cover Oregon."  Governor Kitzhaber's opponent, Dennis Richardson, stated that Governor "Kitzhaber had a responsibility to be accountable to Oregonians" and that Governor Kitzhaber was "so desperate to get out of the Cover Oregon hot seat" that he would "say and do anything to draw attention away from himself."  Public opinion polling revealed that voters placed the blame for Cover Oregon's failures squarely on Governor Kitzhaber, and that negative press attention regarding Cover Oregon threatened the Governor's re-election prospects.

47.   In early 2014, according to publicly disclosed emails, political operatives advising the Governor's campaign determined that the only way to staunch the bleeding was to abandon the HIX and blame Oracle for its purported "failure."  The Governor embraced the plan.

**B.   *The Governor's Political Operatives Take Control of Cover Oregon***

48.   Notwithstanding the fact that the Oregon legislature had carefully designed Cover Oregon to function as an independent, non-political entity, the Governor's political operatives furtively began to guide key decisions at Cover Oregon.  That is, political operatives, for political reasons, secretly took control of the decision-making of an independent, non-political entity entrusted to utilize hundreds of millions of Federal dollars to achieve the objectives of the ACA in Oregon.

49.   Emails furnished to a local newspaper, *Willamette Week*, confirm that "[s]ince at least January [2014] . . . state officials worked closely with Kitzhaber's campaign staff" to influence Cover Oregon's actions.  Similarly, the *Oregonian* quoted a former Cover Oregon employee as stating that Cover Oregon staff "suspected that . . . policy direction was coming from (Kitzhaber's) campaign staff," and that Cover Oregon's

decisions were based on the "the influence [such decisions] might have on [Kitzhaber's] campaign." Records obtained by *Willamette Week* "also show [Patricia] McCaig and other advisers based many of their moves on polling and how voters' perceptions of Cover Oregon might affect Kitzhaber's hopes for re-election."

50.     One Cover Oregon board member actually resigned in part because the Governor and his political operatives had taken control of Cover Oregon. She explained in an email to the board chair that the Governor's involvement had rendered the board superfluous and not worth her time:

> My perception is [the board's lack of authority and oversight capability] has always been an issue, however, it's certainly become more & more apparent since January [2014]. ***At this point, at best, it's become just an advisory board—worst case, the board simply is acting as a public pass through of decisions already made at the state agency level or by the governor's advisors.*** While I don't disagree with any of the decisions recently made, I do have concerns that these processes are exactly what contributed to the failure of the technology build. ***I do disagree with how the board is not being utilized or even consulted.*** That's not what I signed up for and if my time stretches thin, it only makes sense for me to focus where I can make a difference [emphasis added].

51.     The Governor's politically-driven campaign to interfere with the HIX began in earnest in early February 2014—after the HIX's two assisted enrollment channels already had gone live and the third was nearly ready to launch. On February 6, 2014, the Governor's chief political operative, Patricia McCaig, wrote to the Governor to offer assistance on Cover Oregon: "I'd also like to request any publicly available information on the independent review—it's charge timeline, etc. Let me know if you'd rather I let it all alone." The Governor replied by accepting McCaig's offer to help: "I like it when you don't leave things alone (like my last campaign for example)."

52.     The next day, several of the Governor's political operatives participated in a conference call with the Governor and key members of his healthcare team, including the interim executive director of Cover Oregon, Bruce Goldberg; healthcare advisor Sean Kolmer; and the Governor's Chief of Staff, Mike Bonetto, to discuss "CO [Cover Oregon] timelines" and coordinate actions concerning "legislative, media, campaign and stakeholders" related to Cover Oregon.

53.     Following up on this call, McCaig emailed the Governor, making clear that what was needed was "more accountability and follow thru from the campaign and some specific, intensive management of the Cover Oregon issues."  As McCaig saw it, the Governor's office did not have the "staff capacity" to handle "the Cover Oregon piece," and the Governor's team of political operatives, including Mark Wiener, Kevin Looper and Scott Nelson, were available to help.  McCaig thus suggested that the Governor's Chief of Staff, Bonetto, chair a "joint campaign and key staff meeting weekly starting ASAP" and that she "staff him (quietly, privately)."  In addition, another operative, Tim Raphael, would be put in charge of "manag[ing]" what McCaig called "the Cover Oregon Getting it in Perspective Plan," including identifying what the Governor's staff "need[ed] to be managing from the gov office, bridging the information gap with the campaign, and most importantly identifying and teeing up the critical and emerging Cover Oregon issues for the combined team so we can develop a plan and be more prepared both at the state level and the campaign."  Governor Kitzhaber again accepted McCaig's proposal:  "Princess, THIS SOUNDS VERY GOOD TO ME."  McCaig responded that she had talked to "Mark [Wiener] and Kevin [Looper]," that "Tim [Raphael] [was] working on [an] outline," and that "[e]verybody [is] on board."

54.     A week later, on February 16, 2015, McCaig sent Governor Kitzhaber a memorandum explaining the "goals, structure and responsibilities" of the newly-formed "Cover Oregon SWAT Team."   The SWAT Team, to be led by Tim Raphael, was a combination of public employees, including Cover Oregon employees, and campaign advisors, who would "oversee and coordinate," among other things, "policy" and "implementation issues" related to the Cover Oregon "website" and Cover Oregon's "contracts."   The Team would prepare "possible responses/outcomes" on "landmines" related to the HIX website, and would serve as a "rapid response mechanism for website related issues."   McCaig put together this "org chart, goals and overview . . . for the Cover Oregon team" even though, by her own admission, she "barely kn[e]w enough about the topic to write the goals."

55.     The SWAT Team organizational chart McCaig prepared shows that the public employees serving as Cover Oregon's and the State's policy advisors on healthcare issues—including Bruce Goldberg, Nkenge Harmon Johnson, Sean Kolmer, and Patty Wentz—were *subordinate* to Tim Raphael and the Governor's other political advisors. McCaig underscored this point in her memorandum:   "The governor's staff will provide support where appropriate and coordinate all related activities through the project lead/advisory team."

56.     To be clear, the Governor's political operatives were private citizens with no lawful or legitimate role in the decision-making at Cover Oregon.  By contrast, Bruce Goldberg, Cover Oregon's acting Executive Director, owed a duty of trust to the Cover Oregon board and the public interest, was bound by statute to "faithfully and impartially . . . discharge the duties" of his office, and owed no duties to the Governor.  ORS 741.201,

741.001(2).  Nevertheless, by February 16, 2014, the Governor's political operatives had used their relationship with the Governor and his staff to subordinate Goldberg and to assume oversight and policy implementation responsibilities for the HIX's website and Cover Oregon's contracts.

57.     After organizing the Cover Oregon "SWAT team," the Governor's political operatives began to engage in regular weekly calls to manage "the Cover Oregon piece." Nkenge Harmon Johnson, the Governor's Communications Director, who was herself a member of the SWAT Team and copied on numerous communications, summarized the work of the Team and the role of the Governor's campaign advisors:

> For several months in early 2014 the Governor ha[d] been building his re-election campaign team, which consisted of his long-time staffer and advisor Patricia McCaig, my predecessor Tim Raphael, and other advisors. These advisors held weekly meetings with Governor Kitzhaber's executive staff.  The advisors often had weekly, or more frequent, telephone conference calls and emails with the Governor's executive staff, senior policy advisor(s) and senior employees at Cover Oregon.  During my tenure, I witnessed myriad improprieties involving the Governor's re-election campaign team and his official staff, including via email.  Moreover, I *was directed to engage directly with the campaign team, and to conform my work to the needs of the Governor's campaign for re-election* [emphasis added].

58.     A "Cover Oregon Draft Communications Plan" that Tim Raphael circulated to the SWAT Team on March 14, 2014, sheds light on the dynamic Ms. Harmon Johnson described.  Through the Plan, Raphael assigned tasks to members of the Governor's staff, the Oregon Health Authority and the Department of Administrative Services, and dictated the approach that was taken on Cover Oregon issues, including "Oracle – to sue or not to sue?"; "due diligence on technology recommendation"; and "final decision on go/no of

public website." The Plan set up daily calls among Raphael, Looper, Wiener, and members of the Governor's executive staff, including Ms. Harmon Johnson.

**C.**     ***The Governor's Political Operatives Engineer the Decision to Shut Down the HIX***

59.     Ultimately, the Governor's political operatives decided that the Cover Oregon board would terminate the HIX and the State would instead opt into the Federal health insurance exchange—even as (a) Cover Oregon officials themselves were assuring Oracle that Cover Oregon wanted and needed Oracle to continue working on the HIX, (b) the HIX's two assisted channels were already being used to enroll tens of thousands of Oregonians in private insurance and Medicaid, and (c) Cover Oregon intended to launch the final channel, the self-service web portal, shortly.  As reported by *Willamette Week* and the *Oregonian*, emails show that "consultants for [Governor Kitzhaber's] re-election campaign orchestrated the decision to shut down Cover Oregon and switch to the federal health care exchange."  In particular, the records "show [Patricia McCaig, the Governor's chief political operative] oversaw the decision to shut down Cover Oregon rather than work with the state's contractor, Oracle Corp., to fix it."

*1.     How the HIX Was Abandoned*

60.     On March 3, 2014, Cover Oregon announced it had convened a cross-organizational Technology Options Workgroup ("Workgroup") "to advise on the best options to move forward" with developing the HIX's self-service web portal.  The Workgroup was comprised of "business and technical leaders" from the Cover Oregon board and executive team, private health care industry, and state government.  Of the seventeen members of the Workgroup, only three were from the Governor's office or state

agencies—six were from the Cover Oregon board or executive team and eight worked in the private health care industry. Part of the Workgroup's charge was to "evaluate alternatives and recommend to the Cover Oregon Board of Directors the best technology option to support the 2015 open enrollment period beginning November 15, 2014."

61. Cover Oregon tasked the Workgroup to consider a range of options, including whether to: (a) "continue to develop [the Exchange] on the current Oracle based technology and retain Oracle to deliver the solution;" (b) "continue to develop [the Exchange] on the current Oracle based technology but select a new technology delivery systems integrator;" or (c) switch to an alternative exchange such as the federal exchange, healthcare.gov.

62. All signs from Cover Oregon pointed to adoption of the first or second option, each of which would build on, rather than discard, the substantial work the State, Cover Oregon and Oracle already had done to develop the HIX with hundreds of millions of dollars in Federal funds.

63. While the Workgroup was formulating its recommendations, senior Cover Oregon officials informed Oracle that Cover Oregon intended to launch the self-service website in November 2014 and to use the HIX, and Oracle's technology, for the 2015 enrollment period.

64. Consistent with the plans of Cover Oregon's staff, the Workgroup's intended recommendation, as of March 27, 2014, was to complete the HIX and to transition to the federal exchange only as a fallback option if certain milestones were not met.

65. Cover Oregon's continuing commitment to the Oregon Exchange and the "Oracle based technology" was not just the consensus result of its private communications;

it was expressed in public as well.  On April 15, 2014, for example—just days before the Workgroup was scheduled to deliver its recommendations—Cover Oregon Interim Director Hamstreet publicly affirmed the value of the HIX and Oracle's technology. Hamstreet expressed his reluctance to "throw something away that has value," and pointed out that "aspects of Oracle's technology [were] already being used to process applications" and that over 200,000 "Oregonians ha[d] signed up for health insurance coverage through Cover Oregon."  The next day, Hamstreet sent a letter to Safra Catz, Oracle's Co-President at the time, stating that he had authorized the continuation of the agreement that Oracle and Cover Oregon had reached in February 2014—which was due to expire on April 29, 2014—so that the parties could "continue to work together" on the HIX.

66.     Just over a week later, on April 24, 2014, the Workgroup suddenly and without notice reversed direction.  It recommended *discarding* the HIX, which had cost over $300 million in Federal funds to build.  The next day, Cover Oregon's board voted to accept the only recommendation presented to it—transitioning to the federal healthcare.gov exchange—effectively ending the HIX.

67.     The Cover Oregon board's politically-driven decision also required Oregon's Medicaid enrollments technology solution to be transitioned back to OHA from Cover Oregon, at significant additional federal expense.

### 2.     Why the HIX Was Abandoned

68.     The cause of Cover Oregon's abrupt change of course became clear last year, with the release of emails revealing that the Governor and his political operatives had taken control of key decision-making at Cover Oregon and had orchestrated a scheme to

blame Oracle falsely for problems associated with the HIX in order to help the Governor's campaign for re-election.

69.     Consistent with the plan McCaig had devised, the Governor's political operatives directed the recommendations of the purportedly independent Workgroup that Cover Oregon had convened.  In an April 2, 2014 email, for example, McCaig insisted that she "run" an important meeting with Governor Kitzhaber's staff and campaign advisors and Alex Pettit, Cover Oregon's interim Chief Information Officer, regarding the "[c]ontent, process, and timing" of the Workgroup's "IT recommendation" and the "contract, reporting authority, messaging, spokespeople" of Cover Oregon's Interim Executive Director, Clyde Hamstreet.  McCaig and the other operatives had no legal authority to make any of those determinations; indeed, the legislation creating Cover Oregon sought to insulate Cover Oregon from political influence by, *inter alia*, ensuring that the executive director's duties ran not the Governor or his operatives, but to the board of directors, ORS 741.201, and that Cover Oregon was correspondingly "accountable to the public."  ORS 741.001(5).

70.     After Hamstreet spoke in favor of continuing to use Oracle's technology due to his reluctance to "throw something away that has value," McCaig met with him behind closed doors to, as Hamstreet described in his invoice summary to the State, "[w]ork on coordination of proceedings."

71.     Four days after that meeting, one of Hamstreet's top aides told Cover Oregon staff that Cover Oregon was likely to discard the HIX.  Subsequent emails between McCaig and Hamstreet show that Hamstreet's about-face was part of a broader pattern of deference to McCaig.

72.     In the meantime, the Governor's operatives carefully orchestrated the process by which Cover Oregon would abandon the HIX.  In an April 9, 2014 email to Governor Kitzhaber, McCaig outlined, under the heading "MANAGING/STAGING THE DECISION," eight steps that Cover Oregon "would" take leading up to a purportedly independent decision to discard the HIX and utilize the federal exchange instead.  McCaig wrote that ultimately, "[r]egardless" of potential intervening events, "the Cover Oregon Board would hear and accept the federal exchange recommendation April 22, 23, or 24."

73.     That is exactly what happened.  As explained above, two weeks after McCaig outlined in writing how the decision to shut down the HIX would be "managed/staged," Cover Oregon accepted the Workgroup recommendation to abandon the HIX and opt into the federal exchange.  The Governor's political operatives had the Cover Oregon board present—or "stage"—the decision to terminate the HIX as if the board had reached the decision independently.

74.     Governor Kitzhaber and his political operatives thus determined the fate of a project that had cost hundreds of millions in Federal taxpayer dollars to build, accomplishing their explicitly political objective without a fair or accurate technical assessment of the project's capabilities.

75.     Had Cover Oregon conducted a fair, reasonable and accurate evaluation of the progress of the HIX's development as of April 2014, rather than making political decisions indisputably driven by the Governor's re-election campaign, Cover Oregon would not have abandoned the HIX, the hundreds of millions of dollars in Federal funds that already had been expended on it, or the thousands of Oregonians who would ultimately

be forced to re-enroll in the Federal exchange.  To the contrary, Cover Oregon would have elected to continue working with Oracle to complete, maintain and support the HIX.

76.     The decision to abandon the Oregon HIX not only required countless Oregonians to re-enroll using the Federal exchange, but cost Oregon taxpayers substantial additional dollars.  According to the *Wall Street Journal*, the total cost of moving to the Federal exchange was projected to be $41 million.  In addition, at the time the Governor and his political operatives orchestrated Cover Oregon's decision to abandon the HIX, the U.S. Supreme Court had granted *certiorari* in and was actively considering *King v. Burwell*, a case challenging the availability of Federal subsidies for Americans purchasing healthcare insurance through the federal exchange.  Had the Court found in favor of the ACA challengers, no Federal subsidies would have been available to eligible individuals utilizing the Federal exchange.  Accordingly, by causing Cover Oregon to abandon the HIX, the Governor and his political operatives put at risk the insurance subsidies that made health insurance affordable for a large number of Oregonians and thus put many Oregonians at risk of losing their health insurance altogether.

**D.**     ***"Going After" Oracle***

77.     At the same time the Governor and his political operatives engineered the decision to shut down the HIX, they executed the next phase of their plan, which was to "go after" Oracle for purportedly causing the demise of the HIX.

78.     Carolyn Lawson, who was forced to resign as Information Technology Director at OHA, has confirmed the existence of an orchestrated plan to blame Oracle for the decision to abandon the HIX.  Ms. Lawson has stated that individuals associated with both OHA and Cover Oregon organized and encouraged "a substantial cover-up, the

purpose of which was to protect selected individuals…while unfairly and untruthfully pointing the finger at others." The cover up included a "systematic—and factually false— messaging campaign" that "centered on a 'core story,'" a substantial part of which was to blame Oracle for Cover Oregon's failure to launch a publicly-facing website by October 2013. According to Ms. Lawson, OHA's Communications Director told her that "[s]omebody has to be held to blame" for problems with the Oregon HIX and that, although "[w]e want it to be Oracle . . . it can be you if you want"—a thinly veiled threat that, if she expressed any doubts about the "blame Oracle" strategy, she would be unfairly scapegoated as well.

*1.      The Scheme to Repudiate Oracle*

79.      The Governor's political operatives first advised the Governor to take a firm public stand advocating for Cover Oregon to sever ties with Oracle. Because the Governor and his advisors viewed anything less than a full repudiation of Oracle as antithetical to their political objective to blame Oracle for the delayed launch of the HIX, part of this public stand included effectively squelching Cover Oregon's efforts to fully resolve debts of over $60 million the State owed Oracle for uncompensated work. Foreclosing the satisfaction of these debts was a prelude to the State's lawsuit against Oracle.

80.      Despite specifically requesting Oracle's continuing assistance in the period after October 2013, Cover Oregon did not pay Oracle's invoices through February 2014, or even sign the documents necessary for Oracle to bill for its services. As a result, Cover Oregon owed Oracle more than $60 million.

81.     Cover Oregon and Oracle began to engage in negotiations to resolve the payment dispute in February 2014.  This was just as the Governor's Cover Oregon "SWAT Team" was hatching its plan to sacrifice the HIX in order to shore up the Governor's image.

82.     The Governor inserted himself into the negotiations between Cover Oregon and Oracle, even though he had no authority to manage Cover Oregon's affairs.  The Governor met with Oracle executives on February 26, 2014—after two of the HIX's three enrollment channels had gone live and the public-facing web portal was complete and nearing launch—to discuss Cover Oregon's debt and negotiate Oracle's ongoing work for Cover Oregon.  Oracle engaged in these discussions with the Governor given his position as the state's head public official.  (It only became clear later that the Governor was acting for self-interested political reasons.)  To Oracle's surprise, the Governor asserted at the meeting that he wanted Cover Oregon to end its business relationship with Oracle.

83.      On the very same day the meeting with the Governor took place, Oracle executives met with Bruce Goldberg, Cover Oregon's acting Executive Director, additional Cover Oregon officials, and the Governor's General Counsel.  During the meeting, Cover Oregon personnel expressly stated that they had no desire to stop working with Oracle.  To the contrary, they not only affirmed that Cover Oregon needed Oracle to continue working on the project, but also committed to provide additional resources to Oracle for its work.

84.     Ultimately, Oracle agreed to provide additional consulting services to Cover Oregon, and Cover Oregon paid a portion of the amounts owed to Oracle (with Oracle reserving its right to claim the remaining amounts).  The upshot of the agreement was that Oracle and Cover Oregon would continue to work together to conclude implementation of the HIX's final enrollment channel, the self-service web portal.

85.    Given Cover Oregon's express desire for Oracle to continue working on the HIX, Oracle expected that the parties would eventually be able to bridge the gap on the remaining outstanding payments as well.  But to Oracle's surprise, Cover Oregon refused to pay what it owed Oracle.

86.    Upon information and belief, Cover Oregon and Oracle were unable to bridge the gap because the Governor's political operatives interfered in settlement efforts. Although the negotiations were supposed to be confidential, substantial evidence shows that the Governor's operatives were influencing the negotiations in real-time.  For example, in a February 28, 2014 email, the Governor's Chief of Staff, Mike Bonetto, provided Wiener, Raphael and Looper with a summary of the status of the negotiations, including details accurately describing the parties' positions at the time.

87.    Other events show that the political operatives were largely *driving* the Governor's attempt to cut off the relationship between Oracle and Cover Oregon.  On March 2, 2014, for example, the Governor proposed to Wiener, Raphael, Looper and others that he issue a press release concerning the negotiations, with "language . . . intended to mean that we are ending our **current** relationship with Oracle—which does not mean we could not use them as a subcontractor under a system integrator in the future."  That language would have allowed Cover Oregon to keep open the option to "continue to develop [the Exchange] on the current Oracle based technology but select a new technology delivery systems integrator."  This was one of the options examined by the Workgroup (the formation of which was to be announced the very next day) and was to become the option that the Workgroup selected initially.  Wiener, however, thought this approach was "WAY too we[a]k" and instead wanted "to say that the Governor made a command decision to

part ways with Oracle."  Raphael further suggested "kick[ing]" the press release to "Bruce [Goldberg]," the director of Cover Oregon, rather than having the Governor issue it.  The final press release shows that Wiener and Raphael's preferred strategy won out:  Goldberg issued the press release announcing that Oregon was severing its ties with Oracle, and omitted the language to which Wiener had objected.

88.     The Governor's political operatives also shaped Cover Oregon's public comments about Oracle.  Tim Raphael, for example, sent an email on April 2, 2014, providing "priority changes" to testimony that Greg Van Pelt, an informal advisor to Cover Oregon and Governor Kitzhaber, was scheduled to give to Congress regarding Cover Oregon.  Raphael wrote that he and McCaig had "reviewed the testimony" and that they had "focused" changes on Cover Oregon's "transition from ACA success to broken website" and Governor Kitzhaber's efforts to "make sure it [the allegedly broken website] is not a barrier to enrollment."   Not surprisingly, Van Pelt's testimony followed the direction of the Governor's political advisors, blamed Oracle for problems with the HIX, and hinted that the State would soon take legal action against Oracle.

### 2.     The Scheme to Sue Oracle

89.     To amplify the spin that Oracle was at fault for the abandonment of the HIX, the Governor's political operatives also vigorously advocated suing Oracle.  In fact, according to the *Willamette Week,* leaked emails show that "McCaig—rather than the governor or state lawyers—drove the decision to sue Oracle."

90.     As early as March 14, 2014, the Governor and his political operatives were positioning to shift the blame for Cover Oregon's shortcomings by aggressively pursuing legal recourse against Oracle.  Tim Raphael's Communications Plan, which incorporated

comments from Wiener, set up the question of whether "to sue or not to sue" Oracle as part of the Governor's campaign strategy.

91.    Several days after the Communications Plan was circulated among the Governor's political advisors, the Governor announced that he had directed both the Attorney General and outside counsel to pursue "the full range of legal avenues and options" against Oracle.

92.    Emails show that, in subsequent weeks, the Governor's political operatives continued to communicate about shifting public blame for the HIX to Oracle by initiating legal action.  For her part, McCaig decided that the State should "go after" Oracle even before the supposedly independent Workgroup made its recommendations to the Cover Oregon board to abandon the HIX.  McCaig sent Governor Kitzhaber an email on April 7, 2014, stating that she and the Governor's chief of staff had "talked offline about Oracle" and were "leaning, regardless of which option, of announcing we're going 'after' them." McCaig added that she was "[c]obbling a narrative together for [Cover Oregon] thursday which has to do with . . . going after Oracle."

93.    The following month, McCaig wrote in response to an email from the Governor, copying fellow operatives Raphael, Wiener, Looper, and Nelson:

> We need to show the taxpayers we are going after the money.  It doesn't really matter if it is $200 million or 40 million, or how many people enrolled, until we make it clear that we're going after the money . . . our goal between now and November is to keep moving forward, lead the way step by step out of this . . . It is all about offense.

94.    On May 27, 2008, McCaig—*not* a government employee—drafted a letter for the Governor's signature asking the Attorney General to "immediately initiate legal action" against Oracle.  The next day, the Governor returned his edits to McCaig for review.

Once she approved, the Governor sent the letter to the Attorney General and directed his chief of staff and general counsel to coordinate with the Attorney General's office on legal action against Oracle.  The same day, both the Governor's general counsel and retained outside counsel sent Oracle letters threatening legal action.

95.     When the State filed suit in state court several months later—approximately six weeks before the gubernatorial election—McCaig was gleeful:  "Headlines coming in are all good! . . . We've got another first. *** First in the country to sue Oracle!"

96.     The evidence establishes, in short, that the Governor, driven by political instincts and guided by political operatives, induced legal action blaming Oracle for the State's own failures as part of an orchestrated plan to shore up his re-election efforts.  It also shows that the Governor and his operatives initiated the litigation to obtain for the State, in state court under state law, millions in Federal funds that the Governor, his operatives and Cover Oregon had squandered *themselves* by engineering the unwarranted termination of an exchange that already had two fully operational enrollment channels and was on the brink of launching the third.  The Governor took all of these self-interested actions in direct conflict with his duties as a Federal grantee who was entrusted—and obligated under the terms of the Oregon-HHS Cooperative Agreements—to use Federally-granted funds to fulfill the purposes of the ACA.

97.     After Oregon's litigation with Oracle began, the Governor became ensnared in a public scandal that drove him from office.  Of pertinence here, the scandal included revelations that the Governor had instructed one of his staff members to direct the Department of Administrative Services to delete emails from the state email server.  Some

of the emails he sought to delete were the emails referenced above reflecting the political considerations that determined the fate of the HIX.

**E.**   ***Communications after Cover Oregon's Abandonment of the HIX Confirm the Governor's Operatives' Control over Cover Oregon***

98.   Consistent with McCaig's organizational chart for the SWAT Team, documents from May to July 2014 reveal that Cover Oregon leadership effectively reported to McCaig as her subordinates:

a.   On May 5, 2014, Clyde Hamstreet, Cover Oregon's interim Executive Director, sent McCaig a PowerPoint presentation, noting his "portion of the slide deck . . . covers [McCaig's] flow concerns."

b.   On May 23, 2014, Hamstreet solicited feedback from McCaig and others on a presentation that Cover Oregon was planning on making to the Oregon House Health Care Committee on May 28, 2014, concerning developments at Cover Oregon.

c.   On June 9, 2014, Hamstreet sent McCaig and others what he described as a "much revised draft" of a presentation to be given to the Cover Oregon Board.

d.   On July 8, 2014, Hamstreet sent McCaig and Governor Kitzhaber's chief of staff a "draft of questions" to be included in a planned "survey" designed "to obtain independent objective data on the value or harm of the continued use of the Cover Oregon brand to enroll Oregonians in qualified health plans." McCaig responded: "Clyde, you got my text [message] last Monday? This is a bad idea." Hamstreet wrote back: "I think I have an

idea that might work.  Do you have time for a call today or tomorrow so I can run it by you?"

e.   On July 30, 2014, Tina Edlund, Cover Oregon's Transition Project Director, sent McCaig and Raphael a draft PowerPoint presentation regarding the transition to the federal exchange.  McCaig responded, "I think it is way, way too long and needs to be streamline/cut.  Some of the slides can be your talking points. . . .You want to be in control of the room. . . . The powerpoint is to reinforce points/graphics that you are making."

99.    Hamstreet has since confirmed that politics infected Cover Oregon's decision-making.  In his September 29, 2014 report on his tenure at Cover Oregon, Hamstreet wrote that "[p]lanning for Oregon's health insurance exchange should be done in a more businesslike manner," complained of "[e]xcessive politicization of healthcare reform . . . in the state," and emphasized the "[n]eed to get politics out of the picture."

## F.    *The Dissolution of Cover Oregon*

100.    On information and belief, many Cover Oregon board members hoped to drop the Federal exchange by 2016 and set up an Oregon exchange using the Oracle technology.  In fact, HHS's Center for Medicaid and Medicare Services committed $35 million in funding to continue work on the technology for Medicaid enrollment.   If the state exchange, or at least parts of it, could have been revived, then at least some of the millions in federal funding used to develop it would not have gone to waste.

101.    Governor Kitzhaber began pressuring the Cover Oregon board to vote to recommend that the corporation dissolve itself and that its responsibilities be transferred to a state agency.  On information and belief, Governor Kitzhaber did so in order to strengthen

his narrative that Oracle was to blame for the demise of the HIX and end the public discussion of the HIX.

102.    Some Cover Oregon board members and Clyde Hamstreet continued to feel that Cover Oregon should "keep its options open," and suggested that the decision to foreclose the option of returning to a state exchange in 2016 was politically-motivated.

103.    On information and belief, the Governor's chief operative, McCaig, led the push to shut down Cover Oregon and personally exerted improper pressure on Hamstreet and Cover Oregon board members to permanently abandon the HIX and dissolve the corporation.

104.    Ultimately, the Attorney General of Oregon asked the State legislature to enact with unprecedented speed a bill that dissolved Cover Oregon—then a defendant in a federal lawsuit Oracle had initiated to protect its intellectual property and recover on its contracts—and transferred Cover Oregon's liabilities to Oregon's Department of Consumer and Business Services.   The transparent purpose of transferring the liabilities of this legislatively-created public corporation, which was not protected by sovereign immunity, to a state agency that enjoys sovereign immunity was to permit the State to seek to immunize itself from Oracle's pending claims.   In other words, the principal objective of the dissolution of Cover Oregon was to re-write—unilaterally—Oregon's contracts with Oracle so that neither Cover Oregon nor the State would continue to be liable to Oracle for damages.   This heavy-handed maneuvering by Oregon's Executive and Legislative branches, which was intended to avoid contractual obligations involving Federal funds, further demonstrates the need for Federal intervention.

**II.      Oregon's Usurpation of Federal Oversight Authority**

105.    By suing Oracle in its own courts under its own laws to recover Federal funds awarded under the ACA, Oregon has usurped the Secretary's authority under the ACA to oversee the performance and integrity of state grantees and state-based health insurance exchanges.

106.    Oregon is demonstrably unfit to bring any enforcement action seeking to recover the Federal funds used to build its HIX.  Oregon has a clear and exceptional conflict of interest because it has every incentive to evade its own potential liability to the Federal government for grossly mismanaging and then wrongfully terminating the HIX.

107.    Relatedly, Oregon has every incentive to evade its own potential liability to the Federal government for making false statements for the purpose of obtaining continued Federal funding for the HIX.  In an August 2013 mandatory report to HHS on the progress of its work under its Cooperative Agreements, Oregon, through the OHA, made the following knowingly false certification to HHS in order to secure additional Federal funding for the HIX project:  "OHA . . . successfully delivered a functional insurance exchange to Cover Oregon on April 30, 2013."

108.    Oregon's Deputy Attorney General, testifying in a representative capacity for the State, has affirmed under oath that this certification—made in order to secure additional funding for the HIX project—was false.

109.    Oregon undoubtedly felt pressured to make this false certification due to the terms of its grant from HHS, which provided that "[i]n order to fund continued grant awards, HHS must find that each State is making progress towards establishing an

Exchange, implementing insurance market reforms, and meeting such other benchmarks as the Secretary may establish."

110.   By making a knowingly false certification to the Federal government, Oregon violated its mandatory reporting obligations under federal regulations.  45 C.F.R. § 92.40(b)(2) required Oregon to report a "comparison of actual accomplishments to the objectives established for the period," and "reasons for slippage if established objectives were not met."   Likewise, 45 C.F.R. § 92.40(d)(1) required OHA to report in real time, between regularly scheduled reports, when it had "problems, delays, or adverse conditions which will materially impair the ability to meet the objective of the award[,]" including "a statement of the action taken, or contemplated, and any assistance needed to resolve the situation."   Oregon's Cooperative Agreements with HHS contained similar mandatory reporting requirements.  *See also* HHS Grants Policy Statement at II-82 – 83 (reports from award recipients required to permit HHS to carry out its monitoring obligations; "[f]ailure to submit complete, accurate, and timely reports may indicate the need for closer monitoring by HHS or may result in possible award delays or enforcement actions").  OHA's report did not accurately identify any "problems, delays or adverse conditions" or any "reasons for slippage" for failing to meet established deadlines, and it did not include any plan of action "to resolve the situation."  To the contrary, OHA's certification reported phony success and concealed the fact that its objectives had not yet been met and would not be met by established ACA deadlines.

111.   By falsely reporting that it had delivered a functional exchange to Cover Oregon, the OHA not only lied about its actual accomplishments, but withheld the *reasons* for schedule "slippage" and the "problems, delays, or adverse conditions which …

materially impair[ed] the ability to meet the objective of the award"—that is, OHA failed to inform HHS of its own, now well-documented mismanagement of the HIX project and failed to acknowledge that, by pairing the HIX project with the Modernization Project under the ACA's strict timeline, it had taken on too much and had been overly ambitious.

112.     In light of the intentional misrepresentations and omissions it made to HHS in order to obtain additional Federal grant funds, Oregon has clear potential liability to the Federal government for those funds.  If made by a non-state recipient of Federal grant funds, a misrepresentation made in a report submitted to secure continued funding would undoubtedly trigger potential liability under the Federal False Claims Act.  For the same reasons, Oregon's misrepresentation potentially requires Oregon to reimburse HHS for all HIX-related Federal funds Oregon received after making it.  *See* 45 CFR 92.43(a) (providing for disallowance of costs and other available remedies for noncompliance with award terms).  Oregon thus suffers from an obvious conflict of interest in its attempt to prosecute Oracle to recover those funds.

113.     The evidence revealing the crass political motivations behind Oregon's termination of the HIX and its suit against Oracle demonstrates that Oregon has unclean hands that exacerbate its conflict of interest.  The State cannot fairly or legitimately stand in the shoes of the Secretary to oversee and enforce compliance with the ACA when, having mismanaged the HIX project and shut down the HIX for political reasons, the State itself is at the epicenter of the HIX controversy.  It is difficult to imagine a more palpable conflict of interest on the part of a Federal grantee.

114.     The impropriety of Oregon's usurpation of the Secretary's duty to superintend ACA funds is both underscored and compounded by the fact that Oregon's

lawsuit against Oracle is unauthorized, unlawful, invalid, and *ultra vires* for multiple reasons.

115. *Oregon's own statutes expressly preclude all of Oregon's claims.* Oregon itself has expressly disclaimed any State interest in the application of its own laws to claims concerning Federal grant funds. Specifically, ORS 283.020 provides: "***In all cases*** where federal granted funds are involved, the federal laws, rules and regulations applicable thereto ***shall govern*** . . . . (emphasis added). The Oregon health agencies have similar provisions in their general operating statutes. *See* ORS 413.071 (Oregon Health Authority); ORS 409.040 (Department of Human Services); 2011 Or. Laws Ch. 415 § 13 (Cover Oregon). The above language is standard preemption language. Inasmuch as Oregon's suit to recover Federally-granted funds from Oracle is based exclusively on state law, it is *ultra vires* and may not be pursued.

116. *Oregon's state-law false claims act claims conflict with, and are therefore preempted by, Federal law.* The ACA codifies and reinforces the requirement of the Constitution's Supremacy Clause that state laws that conflict with Federal laws are preempted. 42 U.S.C. § 18041(d). Here, Federal law preempts Oregon's OFCA claims on two independent grounds.

    a. First, Oregon's OFCA claims "interfere[] with the methods by which the federal statute"—the federal False Claims Act, which is expressly incorporated into the ACA, 42 U.S.C. § 18033(a)(6)—"was designed to reach [its] goal." *International Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987). Even if the goals of a state law mirror Federal objectives, whenever "'two separate remedies are brought to bear on the same activity,'" or a state

has imposed separate "standards of conduct inconsistent with the substantive requirements" of Federal law, conflict preemption results, because such "'[conflict] in technique can be fully as disruptive to the system.'" *Wisconsin Dep't of Indus., Labor, & Human Relations v. Gould, Inc.*, 475 U.S. 282, 286 (1986).   Here, Oregon's FCA provisions plainly conflict with the federal False Claims Act by substantially expanding the scope of wrongful conduct and by altering the recovery scheme in the following ways, among others:

- Under the Federal FCA, only false statements "material" to false claims are actionable; under Oregon's statute, any false statement, material or not, made in the course of presenting a claim is actionable.   *Compare* 31 U.S.C. § 3729(a)(1)(B), *with* ORS 180.755(1)(b).

- Failure to disclose a violation of the OFCA is itself a violation of the OFCA subject to civil penalties and damages; the Federal FCA does not similarly proscribe or punish the failure to disclose a violation.  *See* ORS 180.755(1)(i).

- In Oregon, litigation fees and costs, including the costs of investigation, are recovered first, before any damages are paid out; under the Federal scheme, such fees and costs are not allowable. *Compare* ORS 180.780, *with* OMB Circular No. A-87 ¶ 19(a)(4).

These and other disparities make the OFCA significantly broader than its Federal counterpart.  Therefore, as applied to Federal funds awarded under the ACA, the OFCA impermissibly conflicts with Federal law.  *See*, *e.g.*, *Arizona v. United States*, 132 S. Ct. 2492, 2503 (2012) (finding conflict in "inconsistency between [a state law] and federal law with respect to penalties"); *id.* at 2505 ("conflict in the method of enforcement");

*Wisconsin Dep't*, 475 U.S. at 286 (imminent conflict occurs "'whenever two separate remedies are brought to bear on the same activity'").

b. Second, Oregon's OFCA claims interfere with the discretion of the Federal government as to how and when to enforce its laws, as well as with the overriding Federal interest in ensuring the proper administration of Federal grant funds. *See Arizona v. United States*, 132 S. Ct. at 2506-07; *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373-77 (2000) (finding that statute's "delegation of effective discretion to the President to control economic sanctions" preempted state sanctions). It is the prerogative of the Federal government, not a state grantee, to decide whether and against whom to seek and obtain recovery for false claims for Federal funds. *See*, *e.g.*, *Arizona*, 132 S. Ct. at 2506 ("By authorizing state officers to decide whether an alien should be detained for being removable, § 6 violates the principle that the removal process is entrusted to the discretion of the Federal Government"); *United States v. South Carolina*, 720 F.3d 518, 533 (4th Cir. 2013) ("[A]llowing the state to prosecute individuals for violations of a state law that is highly similar to a federal law strips federal officials of that discretion."). Oregon's conflicts of interest and unclean hands amplify and highlight the overriding Federal interest in requiring an impartial Federal agency to resolve claims concerning the HIX. In these extraordinary circumstances, where the state is effectively disabled from preserving Federal interests due to its own potential culpability for breaching Federal law, the exercise of the Federal government's plenary

authority is absolutely necessary to protect the Federal interest in the expenditure of appropriated Federal funds.

117.   *Oracle did not submit a "claim" for payment that is actionable under the OFCA.*   Oregon's OFCA claims further fail because they concern invoices paid with Federal funds, not state funds.   The OFCA defines "claim" as "a request or demand made to a public agency . . . that seeks moneys . . . that will be provided in whole or in part by a public body, whether directly or through reimbursement of another public agency that provides the moneys . . ."   ORS 180.750(1).   A "public body" is defined to include state or local government entities, but not the Federal government.   ORS 180.750(4).   Thus, a contractor's invoice qualifies as a "claim" under the OFCA only if it seeks money that will be "provided" at least in part by the *state*.   The state "provides" money when it spends its own dollars.   Insofar as the money "provided" to pay Oracle's invoices was purely Federal grant money, Oracle's invoices were not "claims" under the OFCA and thus do not provide the basis for an OFCA action.

118.   *Oregon did not suffer any injury.*   Oregon's state-law fraud, breach of contract and RICO claims are fatally defective because each one seeks to collect Federal funds in which Oregon has no recoverable interest.   These claims thus fail for the simple reason that Oregon has suffered no cognizable injury and is attempting to piggyback on alleged harms to Federal taxpayers.   All of the funds in question are Federal funds that, if recoverable, must be returned to the Federal government, not to Oregon.   Any failure to repay them would result in an uncollected debt Oregon would owe to the Federal government.   45 C.F.R. § 92.52 ("Any funds paid to a grantee in excess of the amount to which the grantee is finally determined to be entitled under the terms of the award

constitute a debt to the Federal Government."). Insofar as Oregon has no independent interest in the damages it seeks to recover, it cannot satisfy the injury-in-fact requirements for its state-law fraud, breach of contract and RICO claims.

119. All of these arguments lead to one conclusion: Oregon has no cognizable legal interest in, and is otherwise disabled from, bringing claims for the recovery of Federal grant funds under its own laws as the aggrieved party. The function of ensuring that the Federal funds awarded to Oregon under the ACA were properly expended belongs to, and must be exercised by, the Secretary.

### III.    The Secretary's Mandatory Oversight Obligations

120. The Secretary is ultimately responsible for ensuring the integrity of the HIX project. Congress has granted her plenary oversight and enforcement authority for the allowability of all costs incurred under the Cooperative Agreements and for any potential waste, fraud or abuse in their expenditure.

121. 42 U.S.C. § 18033(a)(5) provides that "the Secretary shall provide for the efficient and non-discriminatory administration of Exchange activities and implement any measure or procedure that— (A) the Secretary determines is appropriate to reduce fraud and abuse in the administration of this title [,]" which includes a state's use of Federal funds to establish an exchange.

122. HHS regulations correspondingly provide that the Secretary has "the authority to oversee financial integrity, compliance with HHS standards, and efficient and non-discriminatory administration of State Exchange activities." 78 Fed. Reg. 65,046, 65,048 (Oct. 30, 2013) (final rule). 42 U.S.C. §§ 18033(a)(5), 18031(a).

123.    To meet her plenary responsibility when faced with Oregon's conduct, the Secretary must implement some measure or procedure to determine whether Oregon wasted Federal ACA funds by mismanaging the HIX project, whether Oregon lied to HHS about the status of the HIX to obtain Federal ACA funds, whether Oregon acted inappropriately in terminating the HIX after spending over $300 million in Federal ACA funds to build it, and whether Oregon is acting *ultra vires* and under an impermissible conflict of interest in seeking to recover Federal ACA funds from Oracle.   Indeed, 42 U.S.C. § 18033(a)(4) provides that:

> If the Secretary determines that an Exchange or a State has engaged in serious misconduct with respect to compliance with the requirements of, or carrying out of activities required under, this title, the Secretary may rescind from payments otherwise due to such State involved under this or any other Act administered by the Secretary an amount not to exceed 1 percent of such payments per year until corrective actions are taken by the State that are determined to be adequate by the Secretary.

This language, especially when paired with the other provisions of 42 U.S.C. § 18033(a), plainly implies that the Secretary has a duty to determine, in the face of colorable evidence, whether an exchange or a state has engaged in serious misconduct regarding compliance with Federal requirements.

124.    Given the evidence of mismanagement and misconduct by Oregon and, at a minimum, the existence of Oregon's obvious conflict of interest, the Secretary is obligated to exercise her authority to determine whether Federal funds were spent in compliance with Federal law, standards and procurement regulations.  She may not evade her statutory responsibilities by silently deferring to Oregon.

125.    Regulations incorporated into the Cooperative Agreements at issue here confirm the Secretary's duty.  Under 45 C.F.R. § 92.36(b)(11), the Secretary may "not

substitute [her] judgment for that of the grantee or subgrantee" as to "the settlement of all contractual and administrative issues arising out of procurements" "*unless the matter is primarily a Federal concern*. Violations of law will be referred to the local, State, or Federal authority having proper jurisdiction." (Emphasis added). Inasmuch as the expenditure of Federal funds to establish the HIX under the ACA is "primarily a Federal concern," only the Secretary—not Oregon—may fairly and lawfully investigate and take action regarding any potential violations of law.

126.    HHS's Grants Policy Statement further enunciates the Secretary's obligations to monitor a Federally-funded project or activity:

> Recipients are responsible for managing the day-to-day operations of grant-supported activities using their established controls and policies, as long as they are consistent with HHS requirements. ***However, to fulfill their role in regard to the stewardship of Federal funds, OPDIVs [HHS Operating Divisions] monitor their grants to identify potential problems and areas where technical assistance might be necessary***. This active monitoring is accomplished through review of reports and correspondence from the recipient, audit reports, site visits, and other information available to the OPDIV.
>
> ***… Monitoring will continue*** for as long as the OPDIV retains a financial interest in the project, program, or activity as a result of property accountability, audit, and other requirements that may continue for a period of time after the grant is administratively closed out and the OPDIV is no longer providing active grant support.

HHS Grants Policy at II-82 (emphasis added).

127.    Moreover, should misconduct or noncompliance reveal itself as the Secretary exercises her oversight duties, the HHS's Grants Policy Statement requires action:

> A recipient's failure to comply with the terms and conditions of award, including confirmed instances of research misconduct, may cause an OPDIV to take one or more enforcement actions, depending on the severity and duration of the non-compliance. The OPDIV will undertake any such

action in accordance with applicable statutes, regulations, and policies. The OPDIV generally will afford the recipient an opportunity to correct the deficiencies before taking enforcement action unless public health or welfare concerns require immediate action. However, even if a recipient is taking corrective action, the OPDIV may take proactive steps to protect the Federal government's interests, including placing special conditions on awards or precluding the recipient from obtaining future awards for a specified period, or may take action designed to prevent future non-compliance, such as closer monitoring. If the OPDIV takes an enforcement action as a result of research misconduct or will more closely monitor an award through the use of special conditions, the OPDIV will share this information with other HHS components.

HHS Grants Policy at II-88.

128.    The Cooperative Agreements between HHS and Oregon confirm HHS's

mandatory oversight obligations.  For instance, Oregon's Early Innovator grant provided:

> OCIIO [HHS's Office of Consumer Information and Insurance Oversight] will assign special Project Officers to each Cooperative Agreement award to support and monitor recipients throughout the period of performance. OCIIO Grants Management Officers and Project Officers will monitor, on a regular basis, progress of each recipient.  This monitoring may be by phone, document review, on-site visit, other meeting and by other appropriate means, such as reviewing program progress reports and Federal Financial Reports (SF425).  ***This monitoring will be to determine compliance with programmatic and financial requirements*.**"

Early Innovator Grant at 25 (emphasis added).   Similarly, the Cooperative Agreement

Oregon received to establish the HIX provided:

> Project Officers and Monitoring.  HHS will assign special Project Officers to each Cooperative Agreement award to support and monitor recipients throughout the period of performance.  HHS Grants Management Officers and Project Officers will monitor, on a regular basis, progress of each recipient.  This monitoring may be by phone, document review, on-site visit, other meeting and by other appropriate means, such as reviewing program progress reports and Federal Financial Reports (SF425).  ***This monitoring will be to determine compliance with programmatic and financial requirements*.**"

Exchange Grants at 41 (emphasis added).

129.    Under these requirements, the Secretary may not permit her monitoring and enforcement duties to be usurped by a state that has a manifest conflict of interest, that has unclean hands, and that is acting *ultra vires* and contrary to its own legal authority.  She is legally obligated to carry out those duties herself.   Indeed, where a state governor manipulates implementation of the ACA for his own personal political ends, squandering hundreds of millions of dollars in Federal grant funds in the process, the Secretary—who bears ultimate responsibility for effective implementation—must step in to de-politicize the situation and fix the problem.  At a minimum, as a matter of both law and sound public policy, the Secretary has a clear duty to determine whether such an egregious, politically-motivated wasting of Federal funds occurred.  The Secretary must not, and cannot, defer to a state that has an obvious financial interest in scapegoating a contractor to cover up its own misconduct and that knowingly lied to HHS to secure Federal funds.  Her plenary oversight and enforcement power may vest her with broad discretion, but such discretion does not permit her to close her eyes and sit on her hands in the face of either a state's clear misuse of Federal funds or a state's knowing false certification of project success to secure such funds.

130.    As described below, the Secretary has not fulfilled any of her mandatory monitoring and enforcement duties as to HHS's Cooperative Agreements with Oregon state agencies and Cover Oregon.

## IV.    The Secretary's Failure to Exercise Her Mandatory Oversight Obligations

131.    On several occasions, Oracle has asked HHS to exercise its plenary oversight authority over the integrity of both the HIX project and the conduct of HHS's

Cooperative Agreement partner, the State of Oregon.  Upon information and belief, none of these requests has caused the Secretary to exercise meaningful oversight.

132.    On March 12, 2015, Oracle's General Counsel, Dorian Daley, wrote to HHS's Inspector General Daniel R. Levinson, urging him to investigate a number of decisions and events affecting the HIX that have called into question the integrity of both Oregon state agencies (including the Governor's office) and Cover Oregon in their utilization of millions of dollars in Federal funds.  *See* **Exhibit 1**.

133.    On April 15, 2015, Mr. Levinson wrote back and informed Oracle that he had referred Oracle's requests to the Center for Medicare and Medicaid Services ("CMS") for its consideration.

134.    On May 21, 2015, following up on Mr. Levinson's response, Ms. Daley wrote to Kevin Counihan of CMS, supplementing her March 12 letter to Mr. Levinson. *See* **Exhibit 2**.  In the supplement, Ms. Daley brought to Mr. Counihan's attention the then-recently disclosed wealth of evidence demonstrating that Cover Oregon, having been commandeered by Governor Kitzhaber's political operatives, was at fault for squandering over $300 million in Federal funds by abandoning the nearly-ready-to-launch HIX to facilitate the Governor's re-election efforts.

135.    Oracle never received a response to Ms. Daley's May 21, 2015 letter to Mr. Counihan.  Nor has Oracle received any indication that HHS is, in fact, investigating any of the issues it brought to Mr. Levinson's or Mr. Counihan's attention.

136.    On January 13, 2016, Ms. Daley wrote directly to the Secretary, with a copy to HHS's General Counsel.  In the letter, Oracle again summarized the evidence showing how Oregon had squandered millions of dollars in Federal funds for political reasons, and

asked the Secretary to exercise her oversight responsibilities under the ACA to direct Oregon to seek to stay or withdraw its lawsuit so that HHS could make an independent determination about what liabilities involving Federal funds, if any, have arisen from the HIX project.  *See* **Exhibit 3**.  Outside counsel for Oracle followed up with a voice mail to the General Counsel the same day.  *See* **Exhibit 4**, Declaration of John F. Cooney, at ¶ 4.

137.    Oracle has received no response—not even a return call.  *Id.* at ¶ 5.

138.    The Secretary has not otherwise exercised her mandatory duty to monitor the integrity of its Cooperative Agreement partner, the State of Oregon, or the integrity of the HIX project.

## CAUSES OF ACTION

### Count One
### (Writ of Mandamus, 28 U.S.C. § 1361)

139.    The allegations set forth in paragraphs 1 - 138 are repeated and incorporated as though fully set forth here.

140.    The Secretary has a non-discretionary duty under the ACA to ensure the integrity of the HIX project and the conduct of the State of Oregon, which received hundreds of millions of dollars in Federal funds under Cooperative Agreements with HHS to establish the HIX.

141.    The Secretary has failed to exercise her non-discretionary oversight obligations under the ACA by: (a) refusing to promptly investigate Oregon's mismanagement of the HIX project, Oregon's  misrepresentations to HHS to secure continued funding for the HIX project, and Oregon's decision to abandon the HIX after spending over $300 million to Federal funds to build it, and (b) permitting Oregon to

proceed with an unlawful, *ultra vires* lawsuit to recover Federal funds that Oregon itself bears responsibility for wasting due to both its mismanagement of the HIX and its politically-driven decision to abandon the HIX.

142.   The Secretary's failure to exercise her non-discretionary oversight obligations authorizes this Court to issue a writ of mandamus requiring her to exercise them by (a) directing Oregon to seek to stay or withdraw its lawsuit in state court against Oracle, and (b) making an independent determination of what liabilities involving Federal funds, if any, have arisen from the management and ultimate abandonment of the HIX project. *See, e.g.*, *Adams v. Richardson,* 480 F.2d 1159 (D.C. Cir. 1973) (requiring HEW Secretary, under Title VI of the Civil Rights Act, to initiate compliance proceedings against states that maintained segregated schools and did not submit desegregation plans); *Robinson v. Pratt*, 497 F. Supp. 116 (D.Mass. 1980) (issuing writ of mandamus to require HHS Secretary, in fulfillment of his mandatory enforcement obligations under the Social Security Act, to impose sanctions on a state whose financial eligibility requirements for Medicaid benefits had been determined to be in conflict with the Social Security Act and HHS regulations).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Oracle respectfully requests that the Court:

1.   Enter judgment in its favor and against the Secretary in her official capacity;

2.   Declare that, as to the State of Oregon and the Oregon Health Insurance Exchange, the Secretary has failed to exercise her mandatory oversight duties under the ACA to monitor the integrity and performance of states and state health insurance exchanges that receive Federal funds;

3.    Issue a writ of mandamus to the Secretary requiring her to exercise her mandatory oversight duties under the ACA by: (a) directing Oregon—HHS's grantee—to seek to stay or dismiss its lawsuit against Oracle; and (b) monitor and investigate all work Oregon and its subgrantees and contractors, including Oracle, did on the HIX project in order to determine what liabilities involving Federal funds, if any, have arisen from the HIX project; and

4.    Grant Oracle such other relief as the Court deems just and proper.

Date:   March 8, 2016

_____/s/_____
Seth A. Rosenthal (Bar No. 482586)
John F. Cooney (Bar No. 936336)
Brian L. Schwalb (Bar No. 428551)
Mitchell Y. Mirviss (admission pending)
Venable LLP
575 7th Street, NW
Washington, DC 20004
sarosenthal@venable.com
jfcooney@venable.com
blschwalb@venable.com
mymirviss@venable.com
Tel.: (202) 344-4000

_____/s/_____
Jamie Gorelick (Bar No. 913384)
Edward N. Siskel (Bar No. 485162)
WilmerHale
1875 Pennsylvania Ave., NW
Washington, DC 20006
Jamie.Gorelick@wilmerhale.com
Edward.Siskel@wilmerhale.com
Tel.: (202) 663-6000

_____/s/_____
Robert P. Reznick (Bar No. 295691)
Karen G. Johnson-McKewan (*pro hac vice* to be filed)
Robert S. Shwarts (*pro hac vice* to be filed)
Erin M. Connell (*pro hac vice* to be filed)
Orrick, Herrington & Sutcliffe
1152 15th Street, NW
Washington, DC 20005
rreznick@orrick.com
kjohnson-mckewan@orrick.com
rshwarts@orrick.com
econnell@orrick.com
Tel:  (202) 339-8400

*Counsel for Oracle America, Inc.*